## Case No. 13,613.

### The SUNBEAM.

[Blatchf. Pr. Cas. 316.] ¹

District Court, S. D. New York. Jan., 1863.²

PRIZE — OVERWHELMING NECESSITY — BURDEN OF PROOF—FALSE DESTINATION—CONTRABAND GOODS.

1. Where it is claimed that a vessel was compelled to attempt to enter a blockaded port by an overwhelming necessity, arising from injuries received at sea, and the loss of fuel, water, and provisions, the burden lies upon her to establish the necessity.

2. Ignorance of the master as to his cargo, and as to any of it being contraband of war.

3. False destination on the vessel's papers.

4. Vessel and cargo condemned for an attempt to violate the blockade, and to supply to the enemy articles contraband of war.

In admiralty.

³ [From 1 Am. Law Reg. (N. S.) 277.]
¹ [Reported by Samuel Blatchford, Esq.]
² [Affirmed in Case No. 13,615.]

BETTS, District Judge. This vessel was captured September 28, 1862, at sea off New Inlet, North Carolina, by the United States man-of-war State of Georgia, and was brought into this port for adjudication. A libel was filed against her October 17 thereafter, and an attachment and monition were issued thereon, returnable on the 4th of November, demanding the condemnation of the vessel and cargo. Due service was made of the process, and the return was filed in court by the marshal November 4, 1862. On the same day Mr. Archibald, the British consul, resident at this port, intervened officially for the owners of the vessel and cargo, as being British subjects, and claimed the prize as their property. The proctor for Mr. Archibald also interposed, December 30 thereafter, a claim on behalf of Joseph Greenwood, of England, through his attorney in fact, as the owner of eighteen bales of worsted stuff goods captured on board the said vessel, asserting that they were lawfully shipped as his sole property on a voyage from Liverpool to Matamoras, in Mexico. He also denies in his claim that they were subject to the control of the master of the vessel, and avers that the consignment was in the sole charge of the agent and attorney in fact of the claimant, and further denies that they were lawful prize of war. Although these claims are amplified as pleadings, for the purpose of including other matters, they can only enure to effect a general issue of prize or no prize. On the 27th of December, 1862, Henry Lafone, also a British subject, resident in England, intervened, by his attorney in fact, with leave to file his claim as of the return day of the process, November 4, 1862, and claimed to be sole owner of the vessel and of the whole of her cargo at the time of her seizure. The test oath to this claim is subscribed and sworn to by the attorney in fact. The vessel was British built, and was registered at London January 19, 1858. Her shipping articles were dated at the same port August 1, 1862, for a voyage from Liverpool to Halifax, thence, if required, to any ports and places in British North America and the United States, the West Indies, the Bahamas, and Matamoras, and back to a final port of discharge in the United Kingdom, not exceeding twelve months. On the 1st of August, 1862, the vessel cleared from Liverpool for Halifax, with a bill of health, for a voyage to Matamoras, and at Halifax, on the 6th of September, 1862, she took a further clearance for Matamoras. The outward manifest of the cargo from Liverpool represented it all as deliverable to order at Matamoras, except one consignment of casks of hardware, deliverable there to named consignees. A very large proportion of the shipment consisted of military supplies, equipments, and materials, and was contraband of war in character, if destined for any rebel port in the southern states, or for the use of the enemy. The vessel sailed from Halifax September 14th, and was captured on the 28th of the same month, about a mile off Cape Fear inlet, North Carolina, early in the morning, heading directly into the port of Wilmington. She was arrested by the United States blockading squadron stationed at that place. The prize did not approach the vessels when first descried from them, or make any signal of a desire to speak them, but endeavored to avoid them, until she was brought to by repeated shots directed by them against her, and so near by as to put her in imminent danger, and once to actually hit her.

The lawfulness of the capture is resisted by the defence by the usual exceptions taken in like suits to the competency of the court to take cognizance of the alleged cause of capture: (1) That no lawful blockade existed. (2) That the claimants had no legal notice of it. (3) That the captured vessel was neutral property, destined to a neutral port, with a lawful cargo on board. And it is finally and most essentially insisted, with urgent earnestness, that the proximity of the vessel to Wilmington, the place of her seizure, was caused by her perilous condition at the time, brought about by stress of weather, and by her necessity therefrom for immediate succor; that she had been compelled to deviate from the voyage she was prosecuting on in encountering a violent gale of wind at sea, which disabled her equipments, destroyed her coal and water and provisions, and drove her to seek the nearest and most instant relief in port. The entire evidence shows the vessel to have been arrested close in shore, heading directly into the port of Wilmington, then watched and beleaguered by a strong United States naval force; and, accordingly, the only question demanding consideration in the case is whether the excuse of necessary deviation set up by the defence is credibly supported by the evidence produced in the cause. The legal questions put forward by the claimants have been so repeatedly adjudged by the court during the progress of prize suits through the court during the past year that it will be of no service to repeat the reasons on which those decisions were founded. This case will, accordingly, be determined on the assumption that Wilmington was at the time of this capture under a state of legal and efficient blockade by the United States; that the master and owner of this vessel and cargo had notice and knowledge of such blockade; and that there was nothing in the fitment, ownership, or destination of the vessel or cargo which affords to either any exemption in law from arrest for the cause alleged in the libel. The case then resolves itself into a question of fact alone,—whether the vessel was, when seized, pursuing an honest voyage, according to the representations on her papers, or was really fitted out for trade with the enemy, and was attempting to enter the port of Wilmington, North Carolina, with intent to

evade the blockade then in force there. This inquiry is to be answered by a just application and appreciation of the facts and circumstances put in evidence before the court on the hearing of the case. The position of the vessel immediately at the mouth of the harbor, at an early hour of the morning (she having run during the night, under steam, close along shore), and her shaping her course for its entrance, are facts stated plainly in the proofs. This situation is sought to be justified by her condition of distress, and by the allegation that she was compelled to make the harbor because of injuries received at sea, and the loss of fuel, water, and provisions in consequence. If that justification is not made out by the proofs, the culpability of the act is most palpable. The burden of proving the existence of the overpowering necessity alleged by the defense is cast by law upon those who set it up.

The first criminating act directly affecting the voyage from Halifax occurred in the deviation the vessel made from the true course of her declared voyage towards Matamoras. The time, place, extent, and cause of the deviation are not given with satisfactory uniformity or clearness by the witnesses who testify to the occurrence, and to many of them the fact that the regular course had been departed from was not known until the capturing vessels came in sight and were pursuing her. Some of her crew, the evening preceding, when her sails were being furled, supposed that her voyage to Matamoras had been completed by the arrival of the vessel at that port, and were unaware she had turned out of her course until they found she was trying to enter Wilmington. The second mate says that the vessel was sailing, to the time of her capture, towards Matamoras, so far as he knew. Two logs were kept on the ship,—one the ship's log, and the other by the first engineer of the vessel. The narrative of the gale, or hurricane, as it is denominated, is described in sufficiently strong terms as to its suddenness and violence in the two logs, but neither one specifies its duration, or what, if any, injuries to the ship, her tackle or lading, were experienced from it, or whether the navigability of the vessel was in any way arrested or impeded by it. This gale came on, as would appear by the entries, early on Saturday morning, the 19th of September, and the engineer's log represents that his part of the vessel, which was most affected by the storm, was entirely cleaned up and relieved from its effects the next day, Sunday. Yet it was on the 28th, eight days afterwards, that she was attempting to get into Wilmington. The evidence also shows that the steam functions of the vessel were only used as an aid to her navigation, and generally only in leaving or making port, or in approximating land. Otherwise, sails were the general propelling power employed during the voyage. It is not proved that the capacity of the vessel to continue her course was at all interrupted by the occurrence of the storm, or that her safety or her sailing qualities were in any way impaired or endangered. But the more material fact is that no note is entered in either log that the vessel changed her direction because of the storm, or that distress or peril of any kind on board rendered a deviation necessary. Indeed, the log shows that the vessel held about a uniform course of southwest, or southwest-by-west, or southwest-by-south, during the 16th, 17th, 18th, and 19th of September, retaining the general bearing, and under a northeast wind standing towards the coast up to the time of this gale; and no suggestion is entered on either log that the vessel was off the proper course to Matamoras, or was driven by the storm from the one she meant to pursue. The entries of the vessel's log from the 20th of September, the day after the storm, during the 21st, 22d, 23d, 24th, 25th, 26th, and 27th, when the log ends, note the vessel as running the same general southwesterly direction, with a northeasterly wind, down to her capture. The proofs in preparatorio also are that the true course was adhered to until the day previous to the capture. The master testifies that he was heading the ship right on the land when the gun was fired to bring her to; that he was then actually within a mile of being inside the port of Wilmington; that this was about 5½ o'clock a. m. on a dark, rainy morning; that after the gale of the 19th of September, which did the vessel some damage, he beat along down the coast; and that on the evening before the capture he altered the vessel's course, and stood in for Wilmington. Other witnesses prove that three shots were fired, one of which hit the Sunbeam before she came to and surrendered, she having got under the guns of the enemy's fortification, which opened fire for her protection.

I shall not, however, further pursue the analysis of the proofs in preparatorio, to demonstrate that the statements made by the officers of the vessel are reserved, inconsistent, and unreliable with respect to the prize and her doings from Halifax to Wilmington. The chart taken on board the vessel, having delineated on it carefully the route she pursued from Cape Sable to Wilmington, with her progress day by day distinctly entered, and evidencing great care and accuracy in keeping the record, proves, beyond all reasonable doubt, the subterfuge and falsity of the pretence that the vessel was disabled in her navigation by the storm of the 19th and 20th of September. It moreover demonstrates that the Sunbeam, at the time of the storm, deviated at right angles from the course she was then running, broad on towards the coast, and continued in that new direction for at least one degree of longitude; that then, in about the latitude of Montauk, 41° north and longitude 69° west, she bore off at right angles, parallel to the preceding course from which she had deviated on the 19th; that thence she pursued her way southwardly

along the coast, registering on the chart day by day the line and relative distance of her movement, the general trending of it being inland, and more decidedly so on the 25th of September, when she arrived opposite to Albemarle Sound, somewhere between Currituck Inlet and New Inlet. Thence her bearing, during the two succeeding days, was more broadly upon the coast. The delineation and registry of the course terminated on the 27th of September, near the point of her capture on the morning of the 28th, where she met and was seized by the blockading squadron. This record, made evidently by the navigator of the vessel with marked care and intelligence, supplies to my mind most persuasive proof that the line of navigation followed after the storm was not induced by any physical necessity in respect to the vessel, her equipments or her crew, but was wholly voluntary, and in fulfilment of the plan and purpose of the voyage from its outset.

As before intimated, the log of the vessel supplies no facts calling for or excusing the wide departure of the vessel from the destination which the claimants allege to have been the true voyage contemplated. Indeed, no evidence is given that the direction of the vessel at the commencement of her course, near Cape Sable, was the usual and proper one for a voyage to Matamoras; and if, of itself, it imports no positive fault that her direction was so significantly landwards, it would at least seem to demand from the officers of the ship an explanation of the reasons or rules of navigation which rendered such position and bearing suitable and proper. The diagram of her actual movements, as above referred to, affords a strong suspicion that the actual destination of the vessel was to some port north of Cape Florida. That suspicion is augmented on the production of the maps and charts found on board of a vessel. She had a general English chart, including only the United States ports on the west side of the Atlantic, and two American charts, from the United States Coast Survey, —one from Cape Fear to St. Catharine's Island, and the other from Albemarle Sound to Cape Fear. There is, prima facie, a flagrant improbability that a vessel of this burden, complement of crew, and cargo, would be despatched from Liverpool on a destination to Matamoras, in Mexico, supplied with no nautical guide, by map or chart, and without being in charge of navigators personally familiar with that portion of the route independently of the aid of such guidance. The ignorance of the master in respect to the lading of the vessel, and to whom or for whom any part of it was being transported, gives ground for suspicion that there is studied reserve or false representation as to the real state of facts in relation to the lading and condition of the vessel, and the actual aim and business of her voyage, and that these were well known to the officers on board, and

were concealed in the vessel's papers and in the proofs in preparatorio. It is singular that the master only knew of there being one gun and two rifles on board, whilst the mate, the engineer, and others, knew that she brought four mounted cannon from Liverpool, and had them on deck until the storm, when three of them were thrown overboard by the crew, or, as some of the witnesses suggest, were blown overboard by the tempest. It is, likewise, in a degree remarkable that the master had no knowledge that the vessel was carrying any cargo that would be contraband of war, if intended for an enemy port, excepting one hundred and forty tons of gunpowder, and some brandy, lead, and shoes; whereas, on the breaking up of her cargo by the order of this court, she was found also stowed with nine cases of swords, four hundred and ninety-seven boxes of fixed ammunition, five boxes of percussion caps, fifty cases of Enfield rifles, large quantities of pig-lead, and one hundred and thirty-nine boxes of boots, besides other materials manifestly destined for military uses. It seems, also, to be doubtful, upon the claims filed, who is the true owner of the prize property. Lafone interposes and files his test oath, swearing that he is the owner of the vessel and the entire cargo; and Mr. Greenwood also claims, under a like test oath, to be the sole owner of eighteen bales of woolen stuff goods,—a portion of the cargo; the two claims evincing a want of that clear discrimination of title to property which is rightfully to be expected in the contestation of a suit prosecuted against it for being unlawfully transported to an enemy port, in violation of the belligerent rights of the libellants. Besides, I think that the proofs bear hard to show that the allegation of distress or peril set up as justifying the open deviation of the vessel from a destination to Matamoras is groundless and false, inasmuch as other vessels came in sight after the storm of the 19th of September, and were not spoken, nor was any signal displayed by the Sunbeam denoting that she was in distress, and she proceeded through several degrees of latitude southerly, down the coast, within a distance rendering it easy for her to have gone into open ports had there been real cause for her to seek relief therein. Without entering into an elaborate analysis and discussion of the numerous particulars in proof, I find, as the result of my consideration of the case, that the representation of the voyage of the Sunbeam, stated in the vessel's papers and on the preparatory examination to have been from Halifax to Matamoras, was simulated and illusive in point of fact, and that the true object of the voyage was to proceed to Halifax to a blockaded port in one of the seceded states, and to deliver there the cargo to the use of the enemy, and in violation of the blockade there existing.

I am satisfied that the evidence in the cause naturally leads to and demands such

conclusion, and I therefore pronounce for the libellants that the vessel and her cargo be condemned and forfeited for an attempt to violate the blockade of the port of Wilmington, North Carolina, wilfully, and well knowing of such blockade, and to supply to the enemy articles contraband of war.

[This decree was affirmed, on appeal, by the circuit court. Case No. 13,615. For a motion to stay a sale of the property, see Id. No. 13,614.]